Estate of Nicholas Ventrella. Will the parties please step forward. And I wish this thing could move. I am too short. I wish I was taller. I swear, they need to uplift this seat or something. Every time I have an oral argument, I have to move this way so I can see everyone. Will the parties first identify yourselves for the record and who you represent. Good morning, Justices. My name is James Dahl. I represent James Ventrella, the Appellant. My name is Michael Coleman. I represent the Nick Estate, the Appellant. All right. We generally give 15 minutes for both sides. I think there may be questions, and so we will, of course, extend the time for that purpose. But, Counsel, would you like to reserve some time of the 15 minutes that we initially started out with? If I could, I would like to reserve three minutes for recall. All right. That's fine. Okay. Then, Counsel, you can begin when you are ready. And, Justice, I'm going to have to sit close to you because I can't see you. Come on over. Hello. If the Court please. James Ventrella, and I will refer to him as Jamie. There are a lot of Ventrellas, and Jamie is his nickname. How about James? Would you like James? Yes, I would. Well, then, let's do that. All right. James. James Ventrella served a point in time as the executor of his brother's estate. That's Nick's Estate. If I can, I will refer to Nick's Estate, the executor who brought an action against James, as the estate. Jamie was not only the executor. He was also an officiary of the estate to the extent of 50 percent. The other 50 percent was to be inherited by his other brother, Joseph Ventrella. James mishandled and conceded for the purpose of appeal a minority interest that Nick's Estate owned in a company called Property Dynamics, LLC. Nick's Estate owned a one-seventh interest in that company. The issue with respect to the damages in this case centered around the value of that one-seventh interest. There are two issues, I believe, before the court today. One is whether or not the determination of the value of that one-seventh interest was performed consistent with the law. The related question is, was it performed consistent with the manifest weight of the evidence? Our answer to each of those is no. It was inconsistent with the law because the trial court relied on one and only one factor, and a factor never recognized by any Illinois court, and that is the trial court relied entirely on a line entry on a K-1 called capital account. A capital account has never been recognized by any Illinois court as even a relevant factor in determining the value of a closely held corporation. We put that in our brief. I fully expected that if there was such a case that we couldn't find it, we would have heard about it in the response. We heard nothing other than some explanation that said, well, they don't reference cash, capital accounts rather. They don't reference capital accounts because the statute for limited liability companies hadn't been adopted. Well, capital accounts have existed for 60 years with respect to some chapter, us corporations, partnerships, and the like. The reason we believe that it's inconsistent with the manifest weight of the evidence is simple. Usually these disagreements regarding the value of a minority interest is a fight between experts. Experts disagree about the methodology. They disagree about the calculations, and there's a fight between experts. Here, there was no expert testimony offered by the estate. They offered one piece of paper, a K-1, that says under capital account a number, $2,800,673. That is precisely the number of the judgment entered by the trial court. The trial court afforded no explanation as to how she arrived at that number, but it's clear that she arrived on the document and the arguments presented by counsel, but they didn't present any expert testimony that said- I'm sorry, I hate to interrupt you, especially in an unloving sentence, but what about Gaber's testimony? Let's talk about that. That's what I'm about to ask. What about Gaber's testimony about the capital account and what was in it and where distributions came out of that capital account and how people got paid their salaries, I think, of $240,000 from that account? That's exactly what's going next, Justice, and let's talk about that. No expert testimony offered on the subject of valuation in general and the definition of capital account in particular was by Holland Gamer, a CPA, experienced in valuations, and he said capital account has nothing to do with value. It's a scorecard. Here's where you keep score. You start with your initial investment. How much money did you put in? You reduce from that number any losses that are incurred by that company over time. And don't you put in the gains? Exactly, exactly, Justice. And then you also take out any distributions that people get as owners, not necessarily as employees, but as owners. So it's a scorecard. What you put in, losses are deducted, gains or profits are added, and distributions are deducted. And he said it is a scorecard. It is an entry on a ledger. It is not correlated to value, and no other court has ever suggested that a capital account has anything to do with value. Now, let's talk, if we can, about what happens. Well, let's wait a moment and get there. Since 1976 in the Stewart decision, courts have broken down six or seven factors. I'm sorry to interrupt you. Sure. Before you get there, let's talk about this capital account a little more.  So from what I understand, the company was sort of formed after a settlement agreement. Was that correct, with the seven grandchildren? Yes. And all the property, real property, that the grandparents owned were put into this company. And did the capital account reflect the value of that real property divided across the seven grandchildren? The answer is no. Okay. Then tell me why. Do you want to explain to us? Yeah, I will. You know, nobody talked about the operating agreement in this. And the operating agreement seems to give a picture of what happened when the company was formed and defines a capital account, which, when I'm reading it, it seems to reflect that it could be, it was the cash contributions and any real property contributed at the beginning of the formation of the company. That could be, Judge, but that's not what the capital account number in 2019 was. Initially, the capital account would have been what their investments, their equal investments were. But that capital account changes over time. And let me go back. Their initial investments, what was that? Was that purely cash? Was that their proportionate value of the real property? I believe it was the valuation, the value that was attributed to the real property. But there was, to my knowledge, no appraisals conducted or anything like that. Everybody starts out with the same contribution. But over time, if that is indeed the capital account that it came in, that changes based on different distributions that people receive. Okay, so when you talk about that capital account, it's a value. It's not like a bank account, is it, where it's all cash? Exactly right, Justice. It's not a bank account. And it's not a value in the sense that it's a cash value. I think that the estate, both before the trial court and in its brief, has tried to equate capital account with cash value. It's not that. The fact of the matter is that it is, as Gaynor said, a scorecard. And so the fact of the matter is that it has meaning for taxes, but that's it. And it has no correlation, as of 2019, with respect to the actual true value of the company then. Let's think about that. If that property appreciated grammatically, it's not going to be reflected in the capital account. If that property depreciated significantly, it's not going to be reflected in the capital account. Because all the capital account is is my investment, the profits, taking away the losses, taking away the distributions. But nothing to do with the actual real value of that real estate. What about Gaynor's testimony that the estate tax returns for 2019 in that capital account are related to property dynamics had the $2,800,000-plus value, and then the next year there was nothing there. It had no value. Well, that's certainly – I don't know that there was reference – I don't recall Justice Testimony regarding the estate tax on account, but I do know that what happened was this, and this is why we're not challenging the finding that James is liable for the value of the one-seventh interest, and that is it went for a capital account that reflected $2,800,673 to zero because it was redeemed. It was redeemed by property dynamics, and it should not have been. I'll say it again. It should not have been. Then I'm back to the tax return. If there is a 2019 tax return for property dynamics, giving property dynamics a value of $2,800,000 and some change, and then zero, how is it that Mr. – I can't think of his name – James took $2,800,000? I don't recall that testimony, Justice, regarding an income tax return or a tax return for property dynamics. I think that there was reference at some point to you could use – this is the only testimony that I recall – that you could go to the tax return for property dynamics and compute the book value of the company from a tax return, but that's the only correlation that I believe was ever – I'm sorry, that's the only testimony I recall about the tax return and anything having to do with any of the relevant factors in determining value. Book value is a relevant factor. It's like one of the lowest priority relevant factors, but it's relevant. But no court, again, has ever used the capital account entry in a K-1 as even a relevant factor, let alone the center factor in determining value of minority interest in a closely held company. All right. I know there was a hypothetical given in this case to Mr. Gamer about the capital account, and he said if the capital account had $2,600,000 in some change and the defendant took – I'm calling him the defendant – and James took $2,000,000 out, what would then be the value of that capital account? And he said $644,000 something. And I think I'm quoting – he was asked, so it would be cash to cash, and he answered yes. And then when he was asked again, cash out is the direct deduction from the capital account, he replied correct. So taking the account at X value and then it had zero value, why would not the capital account be the $2,800,000? I'm losing it. Okay. Let me see if I can explain it. To say that James took out, in your example, the $600,000, that would reduce the capital account by that much because as we talked about before, distributions reduce it. But in this case, it wasn't James taking it out. It was being redeemed by Property Dynamics for $0. It should not happen. The fact is that the capital account goes from $2,873,000 to $0 because it's gone. It's not in Nick's estate anymore. It's zero. It doesn't mean anybody took that or took that and it has that cash value. It could be more. It could be less. But that depends on the other considerations that we could talk about in terms of the steward case and the standard case, which means you look at a lot more factors, even with book value. And keep in mind, capital account is not book value. It's that scorecard game we talked about. So I don't believe that those hypotheticals, and I now recall what the court is requesting, I don't think that was a cash for cash situation other than to the extent that if James had taken out X dollars from Nick's estate interest in Property Dynamics, that would have reduced that capital account by that much money because that's what a capital account is and how it works. Distributions reduce the capital account. So in that case, there is a correlation between a cash transaction and an effect on the capital account, but that doesn't mean that the capital account has anything to do with the actual value of the company. But the question is, what was the membership interest for? That was really the issue. Yes, yes. Okay, so the operating agreement did have a definition of what a membership interest is. And it says, all right title of interest of a member in the company, including without limits, such member's capital account, right to a distributive share of the cash flow, and right to a distributive salary of the tangible and intangible assets of the company upon the liquidation of the company. So where was that? Where was no mention of that through this whole trial? Justice, I don't know. And I think it could have and should have been a factor, but it wasn't because the point is there are also restrictions on transfer. Yes. And they didn't want to get into that. So the fact of the matter is the players who have the burden of proof and the burden of proving the value, chose not to reduce anything about the operating agreement because it would not have gotten them where they wanted to be. Well, you're right. The operating agreement also defines how, if there's going to be a withdrawal of a member's interest, how it's to be determined. So why wasn't the court given that roadmap of how to determine? This was, in effect, a withdrawal of the interest. The answer to the court's question is, I believe that the plaintiffs chose not to introduce the operating agreement and present that valuation approach to the trial court because it would have gotten them a much, much smaller number. And we simply didn't have the obligation to put out any evidence concerning the value of the interest. Our position as defendants was simply to deal with what evidence they put out. And if they chose to rely entirely upon a capital account, and we believed and still believe that that was an erroneous legal basis, we don't have any obligation at that point to start talking about, here's another alternative way of judgment you could value. We can simply say that valuation approach is simply wrong. Well, don't you have an obligation to fully inform the court so the court can make a decision? And if they're withholding something that you think that might be useful to the court in rendering a decision? Yes, Justice. And the fact of the matter is that when we looked at the operating agreement, it was problematic in my view as to whether or not you could get there without performing appraisals of property and undertaking a substantial amount of expense. But the operating agreement is obviously on the record. Nobody withheld it from the court, but we certainly didn't suggest it should be withheld. It was there. It was for the court. And, again, it's the plaintiff's burden to prove the value. And they chose not to use or reference the operating agreement, and all they presented was capital account. And based on that presentation and their theory, our obligation was simply to tell the court that's not a valid recognized factor and relying on just one factor is wrong. And, in addition, we got into the issue of minority interest and whether or not with respect to minority interest you discount it. The fact of the matter is it's up to the court. In the rival case that they cite, whether you apply minority interest discount for marketability, lack of control is up to the court. They cite a statute regarding dissenter's interest in different stock transactions and say you don't apply minority discount. Well, this isn't that case. And the fact of the matter is, while I still have some time left, I hope, I think there's a fundamental issue here, and that is if the court decides, as we contend it should, that the approach advocated by the plaintiff and used by the trial court relying on capital account was wrong, there's then the issue of what do you do. Do you remand or do you reverse the trial court and enter judgment for James or do you reverse the trial court and remand for a do-over? Admittedly, on first blush, there's something very harsh about a judgment for James. But the fact of the matter is the Tufo case did it and the plaintiff in that case had offered some evidence. The court didn't explain what, that there was a misalignment of funds and accounts, and the court said that's not enough to prove damages in a fiduciary duty case. In addition, a simple example, contract case between a buyer and a seller. Buyer says I want to buy 1,000-widget, seller says I'll sell you 1,000-widget for a dollar apiece, goes to trial. There's a binding and a wishing that they'll breach the contract. But the only evidence that's induced by the plaintiff-buyer is this. If they had given me those 1,000-widgets, okay, I could have increased my sales by 10%. Well, that's interesting. But doesn't give enough evidence to really compute what they would have sold for, what the profits were. So it's something, it sounds like sales, it's related to it, but you get to the appellate court and you say there was no evidence regarding lost profits, they just didn't put it in. In this case, there's no evidence regarding the value of this interest in this company, whether through the operating agreement, through the well-recognized factors in steward and stand, there's no evidence. And should James then, shouldn't have done what he did, but should James be put through an entire other trial where we now this time do it right? I don't know. And the alternative is to do what the court did in Ash, which was to say, okay, you didn't present any real evidence regarding the value of your stock or the breach of fiduciary duty. We're going to do it. Go back. We may not do it again. I think Ash could have been just as well decided with, you didn't do it, we're going to reverse, and we're going to have a judgment for the other side. The fact is, if this were the rigid case, there is in my view no doubt the court would say, you made your decision. You know the law. You didn't introduce evidence that proved damaging. Does the court have any other questions? Well, it's not that the book value is totally irrelevant. Right. Oh, boy. I'm sorry. I'm sorry. And your expert, and I know it's your, or James' expert. Right. The testimony is kind of hollow. It's vague, you know. You would come out thinking this was a bank account. Okay, there's $2.8 million or whatever in cash for James or Nick someplace. And, you know, even the way you describe it, contributions come out, distributions come out, profits go in. But it's in essence a number that was created when the company was formed. Is that right, based on what was the proportionate value of whatever people contributed at the bank? Again, I think the answer to the question is the same. What people put in was the same. I think respectfully, I think Gamer's testimony is clear that capital account isn't book value. Book value is, just if I can, book value is this. Assets minus liabilities, net worth, your percentage of net worth is the book value of your interest. And I didn't say it's not relevant. I'm saying book value is the same as capital account. And, again, I think it gets to this point. A capital account doesn't give you the picture of the value of the underlying assets of the company as at that point in time. It's a historic scorecard that doesn't deal with value. And I'm sorry, if the court thinks the testimony from Gamer wasn't clear. I'm sorry. Let me back it up. He was very clear when he said the book account does not equal the value. Okay. And I fully agree with that being totally clear. Okay. It's just what this capital account, you know, truly meant is hard to grasp because we're not accountants. And nobody really, you know, he didn't really, I don't know if it was the questions or whatever. All the more reason, Justice, that somebody had to bring in an expert to explain it. Now, Gamer may not have explained it as clearly or thoroughly. I think he did. But if others disagree, that's fine. They didn't bring in an expert to explain capital account. They just went, Judge, here's a K-1. This is my concluding remark. The precedential value of a decision affirming this opinion could be devastating for those of us that deal day in and day out, with the valuation of minority interest in closely held corporations. If all you have to do is walk in and go, K-1 capital account. That's all that happened here. K-1 capital account. And if you don't allow this decision to be as complicated and demanding and quite honestly interesting as it is, and allow courts the flexibility and the ability to get into all the factors and weigh them and assess them, it could be devastating. I mean, if people now can legitimately walk in and say, but my K-1 says this, so I get at least this much money or I get this much money, it's just not what the courts have recognized, nor should they. Nor, if this gets affirmed, is that somewhere we wouldn't take the law. There was other evidence, you know, distributions and salaries. And if they had argued that at all in relation to the valuation, or if the trial judge had said, I mean, the, this is what's said about the calculation of judgment. This is in the order of, I think it's August 24, quote, judgment is ended in favor of Anthony Scully as executive of the decedent's estate, and against James Ventrona in the amount of $2,800,673. No explanation for what was considered, and I think it's a fair, fair, fair implication that it's exactly this number, that the factor was the capital account. And yes, there was information regarding salaries, distributions, and those things, but no indication that the trial court ever looked at it or examined those. And I don't think you can leave it at that. Was there any evidence connecting the dots? No. Saying, you know, because they distributed this and they paid this, you then connected to the cash account. If there had been dots connected, we would have addressed those lines that connected the dots. It was just there, and it was, well, you paid yourself a lot of money, or you paid this or you did that. But that's it. But there was no effort to correlate that information with any of the factors recognized in standing with respect to valuating a closely held minority interest in the company. Was there an argument? I'm sorry. I'm sorry. Was there argument connected? No, absolutely not. I let them do exactly what they did, which was to continue to say this mantra, the capital account is the same as the cash value of the minority interest. Was there any either written or oral motion for clarification on the trial court's order? Other than our motion to reconsider, Justice? No. But our motion to reconsider, like our written submission with respect to closing, was, Judge, these are the factors you ought to consider. Among those that you ought to consider were minority discounts or debt, and what we got back was the same thing we got with respect to the judgment, which was motion to reconsider denied. So how do we know that the court didn't consider all the factors that you mentioned in your motion to reconsider? I think, first of all, because, no, there was no effort to correlate that information into any of the recognized factors. There was no suggestion by the court that the court did that. There was no effort by the court in connection with the motion to reconsider to say, you know what, I shouldn't explain how I got there, which is what the court will see or already has seen. In all the valuation cases by both sides, judges consistently tell you how they got there. But, no, I don't think we can indulge that presumption. In simpler cases, that you can just simply say, well, even though this is the exact same number as the judgment the court entered, we're going to indulge the assumption that the court didn't write considerable factors and that's it. I don't think that's appropriate in this context. I recognize the trial court should, because they deserve it. They have the benefit of the doubt in some instances. I don't think you can do that here. Thank you very much. Thank you. Do I still have my three minutes? Yes. Yeah. Thank you. Good morning. Good morning.  May it please the Court. My friend, Mr. Gall, spent quite a bit of time on very small issues that happened at the back end of the case. But what he tried to vary at the beginning and sidestep was the years of dishonest behavior that the Honorable Judge Carolyn Gallagher clearly articulated as, quote, dishonest, not credible, and fraudulent. Even prior to the evidentiary hearing edition here, the trial court had already found that James fraudulently opened the NICA state in a clandestine manner for the sole purpose of engaging in a pattern of malfeasance, embezzlement, self-dealing, and wasting of the assets. That is in the judgment order that she entered. To borrow a turn of phrase from the reply brief, it is self-evident that the $2,800,673 judgment order was not in a vacuum. It was the result of evidence presented at the trial and James' history of behavior that the trial court witnessed firsthand. The decision to find in favor of the NICA state was quite easy. They are now admitting to something that they never admitted to before. However, as the court reiterated in the first moments of the hearing, James had been removed as the administrator of the NICA state for cause on June 16, 2021. Again, the trial court already ruled that James fraudulently opened the NICA state through false pretenses, through lying to her. Procured by this administration, failed to send notices to any of the parties entitled to notice pursuant to the Probate Act. James failed to file taxes for the estate. James failed to pay any expenses of the decedent. He refused to collect funds owed to the estate. I'm sorry. We really do know that James comes here with very unclean hands. Yes. And we would never condone what happened here. But you say in your brief that your first argument about whether or not that $2.8 billion can be supported is you seem to say, page 14 and 15, that the court wasn't determining a value of the company, the interest, that this judge was just crafting a remedy. So you're saying, and you say all the bad and things that we should never condone, things that were done. Is that a way? Please explain to me what you mean by that. Okay. What I mean by that is this case was brought to the Probate Act as a breach of fiduciary duty for crimes committed against this estate. There's a number of problems we have with the way that it is being crafted and framed by James. This was because of James' breach of fiduciary duty. The $2.8 million judgment was for the breach of his fiduciary duty. In all honesty, it could have been $3 million. We actually asked for much, much more. The court didn't specifically state her reasoning behind why she allowed the $2.8 million and didn't give us what we asked for in his attorney's fees. We didn't ask for things like that. We didn't bring an editor in this case. So what I'm saying is the way that she crafted her remedy, they should have asked for clarification if they're going to state that she did this. We don't absolutely know that. And I understand that it doesn't lie, obviously. Yeah, because the case that you cite for this, the judge crafted a remedy, is Weigel. And Weigel's cited all over everybody's briefs. And it's a case determining fair value under the Business Corporation Act. So if you're just saying this was a breach of fiduciary duty case and a judge could just do whatever she wanted to, and so she took the book value and put it down. I would actually point you to the estate of house case. In the estate of house case, that is really where the proposition of a court can create and decide upon a judgment, especially if it's an unambiguous order. Now, if they had a problem with the amount, hey, judge, how did you get this number? They could have asked for a clarification, but they didn't. That's not our responsibility to assist the court in asking for that after we had received the judgment. If they had a problem, they could have asked her. They didn't. What about in the motion that we considered? Didn't they assert that in that motion? No. But you must have presented this. It seems to me you're saying you presented this case as we have an egregious breach of fiduciary duty. Give us the remedy. It was a little more than that, but, yeah, I mean, I guess the way that we were looking at this is that, in reality, we were looking at this as we had spoken with Mr. Gamer before. We understood his positions on these things. We understood the books and records. I had somebody look at the accounting and the tax records. One of the issues that we came up with, and one of the issues I asked Mr. Gamer was, about these capital accounts, this $2.8 million in the capital account, and that's why I was asking about cash for cash and other such things. One of the things that I asked about is I believe it's the 607. It's a way that the IRS code looks at limited liability corporations and partnerships because LLCs are generally taxed under the partnership code. What happens is you can keep two sets of books. You could have one set of books where it's the value of your capital account and the value of the company. It's an election. Or you could have one set of books that's just the capital account, which is the value, the cash value of that account in this instance. In this kind of a case, as Mr. Gamer testified to, if you wanted to take out $1 million, it would decrease your capital account by $1 million. If you added $1 million, it would increase by $1 million. That was the value taken at the time. Now, I also would like to point out at this point that getting a valuation of the business from seven years before it, knowing that two of the witnesses were the co-managers and the other members are the ones who talk, they control everything. How do you do a valuation of a business when you have one person who's been perjuring himself for years, who's a co-manager of the company, and they were supposed to go and that's when Mr. Dahl said, oh, we could redo it. How do you redo it in an honest way when you have a company that is controlled by certain individuals and can come up with anything? Well, that's why you have independent evaluators, correct? Independent evaluators have to get their information from somewhere. Where do they get it from? Well, I would imagine that expert evaluators don't want to uncover it. And so what we'd be doing is we'd be looking at an estate and putting extraordinary burdens on an estate for the fraud of an administrator. So the cost of that was not? The cost of that would be probably, yes, it would be at least $500,000 probably after it's all said and done with the way that the litigation went, with the stonewalling, with the I don't remember. I mean, and the testimony is Mr. Ventrella, James, didn't even remember what he said the day before. He comes in, do you remember that you said this yesterday? No, I don't remember. Do you remember signing this? I don't remember. I don't know. I'm sure I did. The way that the damages were crafted was crafted around the totality of the circumstances surrounding this case, the totality of the circumstances and the control of which the manager or the co-managers had of the company and how all of the people, every one of the individuals that are still in the company, signed the transfer documents. They all agreed to it. They all took. The evidence also shows that they were receiving $15,000 a quarter in distributions. After this transfer occurred, they received $20,000 a quarter, $25,000 a quarter at times.  Because their capital accounts increased. Right. And this I will go to with the Stanton test that Mr. Dahl continues to talk about. In that test, in the Newark test, that is one of the issues. We went through the three or four that actually applied here. One of which, and I asked Mr. Santucci this during testimony, is the company making any money? How much money are you making? He was making $240,000 at that time in salary, plus he was bringing in another $20,000 to $25,000 a quarter in distributions. Mr. Ventura was making $120,000 a year in just management, and then he's making another $100,000 plus in the distributions. So the company was making money. There's no question about that. The rentals, we had testimony about the rentals. We had testimony about other individual things as well, such as the financial ability to pay members' distributions, the earning capacity. Did they pay their bills on time? Absolutely. Did their revenues exceed the expenses? They must in order for them to pay a distribution. Especially knowing that they were paying distributions and capital wasn't coming down. So there was additional money in there. And one of the most important, I know that Mr. Dahl sidestepped it, but one of the most important aspects here is book value is an appropriate, is one of the appropriate mechanisms in order to value this. So this company and this specific interest, because we don't really need the entire company's valuation at that point. What is the interest worth? Book value is appropriate. The Weiler case says it. And the Stanton case says it. Earning capacity of the company, investment value. We don't have an investment value here. This is a closed corporation. Nobody can invest in this. So the second statement factor is out. The history and the nature of the business. Now, I'm sorry to continue, but you had asked Mr. Dahl about how this company was formed. It was formed through a settlement agreement where a number of the children were, a number of the grandchildren, let's call them the Ventura grandchildren, received an inordinate amount of the properties. Through whatever, I'm not going to get into all of that. I know about it, but I'm not going to get into it at all. The Santucci's, there were some threats to sue. The money that went into Property Dynamics was all of the grandparents' property. It was valued. It was valued for tax purposes as well. So there was a valuation. The capital accounts were based on that. A few years later, they realized, oh, there is a problem with the valuations here. We need to write it down. So they went from $6 million capital accounts to around $3 million. They halved it. So the capital accounts were not cash? Partial cash, partial properties. It was the value of, proportionate value of. That is absolutely correct. That is absolutely correct. However, at that point, it became, some of the members had to put in, there was a lot of cash that went into there as well. Just like there was investment accounts, et cetera, that went into the company as well. But they've always been able to pay distributions. They've always been able to, the economic outlook was always great. The market value of stock and similar businesses. All of these were evidence that was brought out at the hearing. The only thing here, if you look through the transcript, a lot of those questions and a lot of evidence having to do with those questions on all the statement factors was actually brought out. Whether Mr. Dahl likes the fact that she goes, okay, well, I looked at everything, and I've made a decision that this is the cash value. Not just based upon. But did the court use the word value? In the opinion? In the judgment court. I think what she said was that that is the judgment. Because she found a lot of their arguments, their argument was that there was a phantom $61 million lien that could come down at any moment. So that was their only argument against it being the cash value. So if you really take it back, their only argument during the hearing, it was not, that's not the cash value. It was the cash value is zero because, only, only because of this $61 million hypothetical lien that could come down at any time. The court found that not credible. So because their sole argument was the $61 million that she didn't find credible, that's another reason why she used the book value of the company, which, again, is part of the WIPO test and is part of the state test. I have a question. You said the court didn't find it to be credible. Where in the record can we find that? That would be on, if you look at the appendix A16, his, and we're talking about James. Yes. His no net value determination was based on the speculation that a third party's tax liability might one day be levied against the LLC. This hypothesis did not provide a credible basis for James' opinion that the LLC had no net value. And that's in the appendix on page 86, you said? Page 16. Oh, 16. Yes, it's the fourth page of the court's order, and it's towards the bottom.  So when they went into this hearing, they went into it trying to disprove the cash value, the market value, or the book value was the value. And this is how they were trying to do it. Well, because you were trying to set the value by the book. I'm sorry, now I've lost track of what you're talking about. What's interesting is I don't know, if you look at how we were trying to set the value of it, we set the value at three point something. And where did you get that? I think, you know what, I'm not, I don't really recall all of the ins and outs of it. I think that had to do with some discussions I had with my client, which, and I think it was because there were some discounts and stuff that had been taken out in the interim and the prior couple of years. So it started when he died, it was maybe at $3 million, and then at 2019, so I kind of met in the middle on that. But there were some other discounts that had been taken out. But it really, I think, Justice, you had a very important point on this, and that is Mr. Gamer's testimony that, oh, sorry, Mr. Gamer's testimony was that this is cash for cash. I can't stress that enough. He said the account is cash for cash. If you put in cash, you get more. If you take out cash, you have less. It is as plain as day. That is the evidence, and remember, the evidence here does not have, the burden here is not on us to prove that this is an appropriate remedy. The burden is that Mr. Dahl and James have to prove, we have to give great deference to the circuit court's determinations, and an appellate court cannot disturb the findings and the judgment if there is any evidence in the record to support such a finding. There is evidence. There is manifest evidence, I believe. But even any credible evidence, which we have through Mr. Gamer, through Mr. Santucci, both of them gave the court credible evidence for a judgment of $2,800,673. That is throughout. So the question is, is that can we look past that? And I do not believe that the court can look past the credible evidence that was presented at the hearing. As for whether or not we provided an expert to account, they did. They did. It might be because of their expert that Judge Gallagher entered this order because he came in and he said, But their argument is your burden. Well, we can do it through their expert. There has never been a problem with that. The problem is, again, one of the vital tests is the book value, and Mr. Gamer consistently said, look at the M3. That is the book value. The M3 is part of the tax return. Look at the M3. It is assets minus liabilities less any deductions or any other activity for that year. That is the book value. That is what we're looking for, and that's what we received. I shouldn't say this. I'm sorry to interrupt. What about their argument that basically the trial court just relied on the one document and that was it? And the trial court doesn't want to explain how it got to the judgment. That's not for us to think about. I'll say this. The second part of your question, that's not for us. They could have asked at any time, hey, how did you get there? It's something that I would have done if I was going to file an appeal, questioning this specific aspect. However, what I would also say about the first part of the question is that, could you repeat that? I'm sorry. Well, counsel, there are more arguments. Oh, the one document, yes. As for the one document, I think there was 20-something exhibits, including the operating account. All of that was submitted. So we had the operating account into evidence. I read from it. We had the transfer documents where Mr. Ventrella is signing as both the administrator of the estate, less than two months after he gets the letters, and then him as the manager of property dynamics and him as the individual. We have those documents in evidence. We have all of the tax returns. We have the tax returns in evidence showing the financial streams throughout the years. We have the K-1 documents in order. We're not looking at a K-1 saying, hey, look at this. First, we have to get there first. And the way that we got from $2.8 million to zero, the only way we got there was by looking at the other people's K-1s as well and saying, oh, that $2.8 million, 25% went here, 25% went here, 25% went here, 25% went here. Also, we looked at the liabilities and the assets. If the M3, if you want to call it the ledger or the value of the company, if you look at that, there are no debts. There are no outstanding debts that would bring that down. Because I do understand that if you're a member of an LLC and there are outstanding debts, the first thing they'll do is they'll take your capital account. They'll take your money because that is what you first have to get. If there's not enough capital to deduct, then they have to make a capital call and they have to get more cash so that your capital account can be funded. That's where this book value issue does come in. So, yes, so as for the we only relied on one document, I don't understand that argument. Because, and I do understand that Mr. Dahl wasn't there for the first couple of days of the trial. But you can see all the documents that we're putting in over and over again. But despite all the other documents you're talking about, it sounds like some of them deal with was there a breach. The number that was given was from the one exhibit. It's on multiple exhibits, but yeah, it's on a lot of the exhibits. But I don't, I guess I can't disagree that the number matches. I can't disagree with that. No, really. However, I wasn't going to ask for clarification on that. I took it for what it was. And it could be the court looked at this and said, because remember, we asked for punitive damages, we asked for attorney's fees, we asked for additional amounts for other breaches. What we got was $2,800,673. Now, would it make a difference if it was $2,800,000? I mean, if it didn't match? I guess what I'm asking is, I guess what I'm saying is, I don't think the specific number, the number itself, if there was a question about it, could have been brought up. Mr. Dahl could have brought in his motion to reconsider where he, most of the motion to reconsider had to do with technical issues, having to do with whether or not a statute was in a heading and things like that. This was not addressed in there. The issue of the statement test, none of that was addressed. And if it was, it was denied. So obviously the court knew about the test and denied it. And as far as going forward, I don't, I believe that the best way forward is by affirming it. I don't think that it's going to have vast repercussions because, again, this was a breach of fiduciary duty case. This was not an evaluation case. This was not a case where we sought to value property dynamics and we filed a chance reaction. This was a probate case. And we're seeking the value of the breach of fiduciary duty to the estate. And that's what's important here because the, I have pages of things that I could talk about having to do with the breaches of fiduciary duty. The trial court should have the authority that the legislature gave them to craft a remedy in any way it sees fit or in any way it sees fit based upon the evidence that was presented. And that's what we have here. When you say legislature, you're talking about what kind of legislation? Under the Probate Act or under some business corporation? In reality, both because we have the Probate Act, which is under equity. So she has the powers under that. But she also has, under the Business Corporations Act, she also has authority under that to craft a remedy. As long as there is evidence in the record that states we have, that states this is the book value. And then if you want to, you can go back to the Weigel and Stamp cases. Is book value one of those seven? Yes, it is. Okay, so this one. Is there evidence that there is the earning capacity of the company? Yeah, there is. It's right here. Is there an investment value? Well, this is not a publicly traded company like in Stanton, so that's kind of gone. The history and the nature of the business. How are they doing? They're doing fine. Are they paying their bills? Yes. The economic outlook. We're doing great. We're paying our, we just, Mr. Santucci, just gotten a raise from $240,000 a year to manage the company. What about the book value? That's what we're looking here. Number five. And I have yet to see a case that says we don't look at book value or that it has any less impact than all the other factors as well. The ability to pay dividends. I would say look past dividends. Let's say, does the company have the ability to pay distributions? The answer to that is a doubtful yes because they've been doing it and they've never missed a payment. And then the last one is the market value of stocks and more businesses. That's an impossible test. But again, there is evidence for each one of those factors in the record. Each one of them, there's substantial evidence. Just because it matches doesn't mean there wasn't evidence. It just means that the evidence showed that that was the amount to Judge Gallagher at that time. Any further questions? Any questions? Thank you. Thank you very much. I thought I heard, certainly be fair to infer, Jones did something stupid. He breached the fiduciary duty. The judge can make up whatever she wants to do. That's happening here. I understand, Judge, but it's just a coincidence. I understand. All right. Okay. But it's just a coincidence that the number is the capital account. And again, I counted nine times. The counsel tried to make book value synonymous with capital account. It's not. I'm not going to go back over all that. The fact of the matter is that the state of Illinois agrees the trial court did that and was not required to set the damages based on a fair market value of Rick's interest in property dynamics. The court pointed out, cites Weigel. Weigel doesn't stand for that proposition. Weigel doesn't breach a fiduciary duty case. It was just a straightforward valuation case. But there was a case that we cited that was a breach of fiduciary duty case. That breach of fiduciary duty was an intentional tort, conversion. And that was the case of Alamis's. This is found in pages 9 and 10. The court in Alamis's, again, dealing with the conversion of stock, it is well established that the proper measure of damages for corporate stock is the market value at the time reasonably close to the date of the breach. If you steal stock, the value is the value of that interest at about the time it happened. The fact of the matter is the court did enter punitive damages against James, and the judgment that was entered can't be based upon a consideration of what could have been a punitive damage award. In addition, counsel repeatedly puts words in Mr. Gamer's mouth, and as indicated in their brief, they quoted Gamer as standing for the proposition that the cash value of each member's capital account is represented on the K-1 as its capital account. You were referred to the record in pages 406 to 410. We pointed out in our reply that testimony isn't there. It's not there. Again, I don't think that the evaluation of this minority interest was done in accordance with established precedent. It was contrary to the manifest way to the evidence where we were the only ones to present any expert testimony defining a capital account. And I think respectfully the appropriate remedy is to reverse and enter judgment for Jamie. Alternative, reverse and remain, and we'll do it again. This time we can do it the right way. Thank you. Thank you. Thank you. Well, I have to say this is a very interesting case. I've done more math than I can put it on file. And we thank you. Thank you both. And we will have a decision for you. I like to say forthwith. We don't know what that means, but that's what we'll do. Thank you to everyone. And we are adjourned.